IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:13CR169-1 |
| | ) | |
| CHAD LEE MORRIS | ) | |

MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Chad Lee Morris's Motion to Suppress [Doc. #15]. Defendant Chad Lee Morris ("Defendant") is under indictment for one count of receiving child pornography and one count of distributing child pornography, both in violation of 18 U.S.C. § 2252A(a)(2)(A). On February 12, 2014, Defendant moved to suppress self-incriminating statements made while he was interrogated by law-enforcement agents during a search of his home, pursuant to a search warrant. The Court held a hearing on the Motion on March 6, 2014. For the reasons stated below, Defendant's Motion will be GRANTED.

I.  FACTUAL BACKGROUND

For purposes of disposing of this Motion, the Court makes the following findings of fact. On the morning of April 4, 2013, approximately eight federal and state law-enforcement agents executed a search warrant for Defendant's home as a result of an investigation into online sharing of child pornography. When the agents approached the residence, many of them had weapons drawn. Some agents approached from the front of the house and some approached from the back of the house. Defendant answered the front door to several agents with weapons drawn, one of which grasped Defendant's arm and physically escorted him onto the porch. Defendant's arms were thereafter restrained behind his back until the residence was secured. Defendant was then led back into the residence and directed to a chair in his living room.

In securing the residence during the search, armed officers encountered Defendant's wife in a dark bedroom. She was awoken by multiple agents, with at least one of the agents pointing his gun into the room she occupied.[1] Defendant's wife was told to put her hands where the agents could see them, which she did. She asked the agents to hand her a shirt to put on, and after she put the shirt on in the agents' presence, she was sent into the living room to wait while officers conducted the remainder of the search.[2]

Early on in the search, Defendant's father arrived on the scene. After asking Defendant two questions while Defendant was on the front porch, his father was instructed to return to his car and told that he could not enter the residence. Although the evidence did not specifically reveal Defendant's age, it was noted that Defendant had no criminal record and that he had not been involved in any previous criminal activity.

Throughout the entire encounter, Defendant was never told that he was free to leave or that he was not under arrest.[3] He was instructed that if he needed to use the restroom or get up

---

[1] The bedroom in which Defendant's wife was sleeping was dark, and the agents who entered her bedroom had their weapons drawn. Though no agent admitted that his weapon was pointed at Defendant's wife, one agent's flashlight was mounted to his firearm and the agents testified that they needed to use flashlights to survey the bedroom when they entered. Therefore, the Court finds that Defendant's wife awoke to at least one agent pointing his firearm and flashlight in her general direction.

[2] The Court notes that there was testimony that Defendant's wife was later instructed to return to the room to put on pants, as her long shirt made it unclear whether she had on shorts or any type of clothing bottom. By that point, she may have been allowed to do this without a police escort.

[3] The only agent who testified that he told Defendant that he was free to leave was Detective Brian Schmitt. Although Detective Schmitt states that he gave this warning while Defendant was sitting in the chair in the living room, while other officers were within ten to fifteen feet of them, no one else heard Detective Schmitt, or anyone for that matter, tell

for any reason, that he was to inform one of the agents before doing so. Eventually, two agents accompanied Defendant into a back room, shut the door, and proceeded to question Defendant for approximately 45 minutes to one hour. It is undisputed that Defendant was not informed of his Miranda[4] rights before or during this questioning.

While Defendant was being questioned, he told the agents that he was supposed to report to work soon. In response, Defendant was handed a phone and allowed to call work to let his employer know that he would be late. The record is unclear as to whether Defendant was handed his own phone to use in order to call his employer or whether he was given one of the agent's phones to use for this purpose. Regardless, Defendant was not permitted to leave the back room to retrieve his own phone for this purpose, and Defendant was not told that he had a choice about whether or not he could leave for work.[5] As the agents questioned Defendant, he made self-incriminating statements regarding the offenses he is now charged with.

---

Defendant that he was free to leave. The Court notes that Detective Schmitt did not keep notes from this search and interrogation. Detective Schmitt reviewed Special Agent Letterhos's report about the interrogation, but those notes did not mention that Defendant was told that he was free to leave. Detective Schmitt did not suggest to Special Agent Letterhos that such a statement should be added to his report. Furthermore, Detective Schmitt's testimony overall contradicts that of multiple officers in other respects, such as whether Defendant's hands were restrained by Detective Miller on the front porch. Therefore, the Court finds that Detective Schmitt's statement that he told Defendant that he was free to leave lacks in trustworthiness. Because there is not additional evidence that Defendant was told he was free to leave and that he was not under arrest, the Court finds that he was not given either of those warnings.

[4] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[5] Special Agent Letterhos was one of the two agents who questioned Defendant in this encounter. He drafted the report and took notes during the interrogation. Special Agent Letterhos testified that he did not hear anyone tell Defendant that he was free to go or free to leave for work. However, he also testified that he did not hear anyone tell Defendant that he was not free to go or that he was not free to go to work.

3

Prior to executing the search warrant, all the agents participated in a pre-search briefing on this search. Those agents were informed that there was a heightened risk of threat associated with the execution of this particular search warrant, due to a variety of factors, including the nature of the alleged offenses. Multiple officers testified that, in light of this heightened risk, they conducted the search in a very serious and authoritative manner, in order to maintain control of the premises while the search was conducted. No effort or attempt was made to communicate, expressly or impliedly, to Defendant after the conclusion of the search that the situation had somehow changed or that the agents had any less authority over Defendant during the questioning than they did when they conducted the search. All told, the eight agents remained in Defendant's home for at least two hours.[6]

Defendant seeks to suppress the self-incriminating statements he made, arguing that he was in custody while he made them, and therefore, should have received Miranda warnings. The Court notes that the Government's Response in Opposition to Defendant's Motion to Suppress [Doc. #16] contained some not insignificant factual inaccuracies about the encounter, which came to light through testimony provided by the Government's own witnesses.[7] At the end of

---

[6] The Government's first witness, Sergeant Caleb Stewart, took photos of the residence while the search was underway. Sergeant Stewart indicated that he was in the first group of agents to leave, which he at first estimated was less than one hour after arrival. However, as defense counsel cross-examined him on the timing, additional time-stamped photographs were provided by the Government, and it was revealed that his last photo was actually time-stamped approximately two hours after the agents arrived to search the residence. Sergeant Stewart testified that he therefore must have been mistaken about his previous time estimate. Therefore, the Court concludes that all eight agents were present for approximately two hours before any agents left Defendant's residence.

[7] For example, the Government's Response in Opposition states that officers never physically restrained Defendant. (Resp. in Opp. [Doc. #16], at 2.) However, the Government's

4

the hearing on Defendant's Motion, the Government acknowledged that there were factual inaccuracies in its Response in Opposition, but indicated that the filing constituted a good faith effort to accurately describe the encounter.

II. LEGAL STANDARD

Defendant has moved to suppress the statements he made during the April 4, 2013 search of his home, arguing that the statements should be excluded because they were obtained during a custodial interrogation without the benefit of Miranda warnings. If the questioning in Defendant's bedroom constituted a custodial interrogation, then Defendant's statements, which both parties agree were made without the benefit of Miranda warnings, are inadmissible. See United States v. Hargrove, 625 F.3d 170, 178 (4th Cir. 2010) ("[O]nly when there is a custodial interrogation is it necessary for the police to provide the suspect with Miranda warnings." (citing Oregon v. Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977) (per curiam)); United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001) ("Absent formal arrest, Miranda warnings only apply where there has been such a restriction on a person's freedom as to render him in custody." (quoting Mathiason, 429 U.S. at 495) (internal quotation marks omitted)). The Government does not dispute that the questioning of Defendant constituted an interrogation. Rather, the Government disputes that Defendant was in custody when he was questioned.

"The Supreme Court has described the test for whether an individual is in custody despite the lack of a formal arrest to be whether, under the totality of the circumstances, a

---

own witness, Detective Miller, testified that he grasped Defendant by the arm, led him outside, and held his hands behind his back until the house was deemed secure.

suspect's freedom of action is curtailed to a degree associated with formal arrest." Hargrove, 625 F.3d at 178 (quoting Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)) (internal quotation marks omitted). This inquiry is an objective test, asking "whether a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." United States v. Hashime, 734 F.3d 278, 282 (4th Cir. 2013) (alteration in original) (quoting United States v. Jamison, 509 F.3d 623, 628 (4th Cir. 2007)) (internal quotation marks omitted). "Facts relevant to the custodial inquiry include, but are not limited to, 'the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.'" Id. at 283 (quoting United States v. Day, 591 F.3d 679, 696 (4th Cir. 2010)).

III. FINDINGS AND CONCLUSIONS

The Government contends that this case is analogous to United States v. Hargrove, in which, the Fourth Circuit held that the defendant was not in custody. 625 F.3d at 182. In Hargrove, ten to fifteen officers executed a search warrant on the defendant's home shortly after 6:00 a.m. Id. at 173. Some of the officers had weapons drawn during the initial entry and security sweep. Id. at 174. The district court found that the officers asked the defendant to speak with them in the kitchen, the defendant was not handcuffed during the questioning, the conversation was amicable and non-threatening in tone, and the defendant was told that he was not under arrest and that he was free to leave. Id. at 175. The Fourth Circuit affirmed the district court's decision that the defendant was not in custody. Id. at 182.

However, there are important distinctions between this case and Hargrove. In Hargrove, the Fourth Circuit relied heavily on "two important facts": that the defendant was told he was not under arrest and was told that he was free to leave. Id. at 179. To be sure, a statement that one is not under arrest is not dispositive. See United States v. Colonna, 511 F.3d 431,435-36 (4th Cir. 2007) (holding that informing a suspect that he is not under arrest is a factor, but insufficient standing alone, to sustain a ruling that the questioning was non-custodial)). Yet, a statement that a defendant is free to leave is "highly probative of whether, in the totality of the circumstances, a reasonable person would have reason to believe he was 'in custody.'" Hargrove, 625 F.3d at 180. This is because a statement that a defendant is free to leave "goes beyond the merely implied permission to leave" that accompanies a statement that one is not under arrest. Id. Therefore, because the Court finds that Defendant Morris was not told that he was under arrest or that he was free to leave at any time, these facts weigh heavily toward a finding that Defendant was in custody—a key distinction between Hargrove and this case.

However, the presence or absence of these two "important facts" are not dispositive and can be outweighed by other objective considerations. For example, in United States v. Hashime, the Fourth Circuit held that the defendant was in custody, despite the fact that he was told that he was not under arrest by the agents at his residence. 734 F.3d at 285. Though some objective factors offered by the Government in Hashime cut against custody (namely, the statement to the defendant that he was not under arrest, the agents' tone of voice, and multiple opportunities provided to the defendant to take breaks during the interrogation), the Fourth Circuit held that they were "decidedly outweighed by other, undisputed objective considerations." Id. Those

7

other objective considerations included "the sheer length of what the government would prefer to characterize as an 'interview,' but which was plainly an hours-long interrogation[,] . . . . '[the] swarming [of the defendant's house] with federal and state agents, [rousing the defendant] from bed at gunpoint, [the defendant and his] family members [were] not allowed to move unless guarded, and ultimately [the separation of defendant] from his family and [placing him] in a small storage room with two agents where he was questioned' by investigators who stated that he must remain under guard and that they needed 'to know the truth.'" Id. (citations omitted).

In this case, Defendant was questioned at his home, which "tends to be more neutral than one that occurs at a law enforcement facility." Hargrove, 625 F.3d at 180. Therefore, the fact that the interview was conducted in Defendant's home cuts against a finding that Defendant was in custody. However, the Court finds that the agents restricted Defendant's movements on the premises in meaningful ways—that is, by physically pulling Defendant out the door by the arm; restraining his hands behind his back until the residence was secured; telling Defendant that if he wanted or needed to get up, he would need to let the agents know before doing so; and shutting the door to the room in which Defendant was ultimately interrogated. Therefore, the restrictions on Defendant's movements within the house provide support for a finding that Defendant was in custody. Cf. United States v. Westmoreland, 542 F. App'x 221, 223 (4th Cir. 2013) (listing factors that would lead a reasonable person in the defendant's position to conclude that he was free to leave and not in custody, including the lack of evidence that officers limited the defendant's freedom of movement in any way); Hargrove, 625 F.3d at 181 (finding that any limitations on the defendant's freedom of movement during the search were only minor, and

therefore, did not weigh toward a finding that the defendant was in custody).

Additionally, testimony was provided as to the state of mind of both Defendant and the agents who were present at the encounter. The Court notes that Defendant's subjective state of mind—whether he was confused, panicked, and/or cooperative—is irrelevant to the custody inquiry. J.D.B. v. North Carolina, -- U.S. --, 131 S. Ct. 2394, 2402, 180 L. Ed. 2d 310 (2011) ("[T]he 'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant. The test, in other words, involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning." (quoting Stansbury v. California, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (per curiam), Yaborough v. Alvarado, 541 U.S. 652, 662-63, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004)). Similarly, the agents' states of mind are also irrelevant to the custody inquiry. Id. Rather, the only probative portion of this kind of testimony is that which describes the outward manifestation of the agents' states of mind, to the extent that a reasonable person would likely perceive those agents' resulting physical cues and interpret the situation as one that he or she is not at liberty to terminate by leaving. As to that point, multiple agents testified that they executed the search warrant in a manner consistent with the warning given them in the pre-search briefing that there was an especially high degree of risk associated with this particular search. Furthermore, even after the residence was secured, no affirmative indication was given to Defendant at any point during the encounter that the authority and control already exerted toward him had somehow changed, such that he might reasonably understand that he was free to leave.

The Court finds that, given the totality of the circumstances, a reasonable person in

9

Defendant's situation would not have felt that he was at liberty to leave and terminate the agents' interrogation of him. Summarily, the Court finds that when Defendant opened the door in response to the officers' knock, he was met by several agents with their weapons drawn, and was pulled out of his house and restrained with his hands behind his back on the porch until the house was secure. In addition, Defendant's wife was awoken by two agents with firearms drawn, one of which had a mounted flashlight that was being used to look into her dark bedroom upon entry. After the house was secured, Defendant was told where to sit inside, and that he had to let the agents know if he wanted or needed to get up for any reason. He was never at any point told that he was free to leave or that he was not under arrest, nor did he voluntarily request to speak with the agents before he was taken into a separate secluded room away from his wife.

Furthermore, in terms of the coercive atmosphere within Defendant's residence, eight agents stayed in the house, during which time, the interrogation of Defendant began, which lasted approximately 45 minutes to one hour. Defendant indicated that he needed to leave for work and was provided with a phone to call and let work know that he would be late. Again, neither Defendant's nor the agents' subjective thoughts as to whether Defendant was free to leave are relevant to the custody inquiry. Though there are factors that weigh against a finding of custody, such as the location of the interrogation (Defendant's home), the lack of evidence that agents' weapons were ever pointed at Defendant himself, and length of the interrogation itself when compared with the longer interrogations in Hashime and Colonna (three hours in both of those cases), the factors do not outweigh the totality of the circumstances that support the Court's finding that Defendant was in custody when he was interrogated.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress [Doc. #15] is hereby GRANTED.

This the 27th day of March, 2014.

                                                                                                    */s/ James A. Beaty, Jr.*
                                                                                                    United States District Judge